UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DEIDRICE RENEE GARRETT,

Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

Defendant.

Civil Action 2:20-cv-1904

Magistrate Judge Elizabeth P. Deavers

OPINION AND ORDER

Plaintiff, Deidrice Renee Garrett, brings this action under 42 U.S.C. § 405(g) for review

of a final decision of the Commissioner of Social Security ("Commissioner") denying her

application for supplemental social security disability income benefits ("SSI").  The parties have

consented to jurisdiction pursuant to 28 U.S.C § 636(c).  (ECF Nos. 5, 6.)  Pending before the

Court is Plaintiff's Statement of Errors (ECF No. 21), the Commissioner's Memorandum in

Opposition (ECF No. 26), Plaintiff's Reply (ECF No. 27) and the administrative record (ECF

No. 20).  For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors

(ECF No. 21) and **AFFIRMS** the Commissioner's non-disability determination.

I.    BACKGROUND

Plaintiff protectively filed her SSI application on August 2, 2016, alleging that she has

been disabled since March 11, 2013.  (R. at 149–50.)  Plaintiff's application was denied initially

in September 2016 (R. at 106–114, 115), and upon reconsideration in March 2017.  (R. at 116.)

In May 2019, Plaintiff, represented by counsel, appeared at a hearing held by an Administrative

Law Judge.  (R. 34–65.)  A medical expert ("ME") and a vocational expert ("VE") also appeared

and testified. (*Id.*) On June 5, 2019, the ALJ issued a determination finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 18–27.) On May 13, 2020, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's non-disability determination as the Commissioner's final decision. (R. at 1–4.) Plaintiff timely commenced this action. (ECF No. 1.)

Plaintiff alleges that the ALJ erred by failing to consider all of Plaintiff's impairments when assessing her residual functional capacity ("RFC"). [1] (ECF No. 21, at PageID # 523–24.) Plaintiff additionally contends that the ALJ erred when relying on the VE's testimony because it was inconsistent with the Dictionary of Occupational Titles ("DOT"). (*Id.*, at PageID # 524–25.) Plaintiff finally alleges the ALJ's subjective-symptom analysis (also referred to as a "credibility determination") was deficient. (*Id.*, at PageID # 525–27.) The Court finds all of Plaintiff's contentions of error lack merit.

## II.    THE ALJ'S DECISION

On June 5, 2019, the ALJ issued the non-disability determination. (R. at 15–33.) The ALJ initially determined that Plaintiff had met the insured status requirements of the Social Security Act on December 31, 2018. (R. at 21.) At step one of the sequential evaluation

---

[1] A claimant's RFC represents the most that a claimant can do despite his or her limitations. 20 U.S.C. § 404.1545(a)(1).

process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity from March 11, 2013, through her December 31, 2018, date last insured. (*Id*.) At step two, the ALJ found that Plaintiff had the following severe impairments: recurrent uveitis, recurrent macular edema and best disease, and cataracts status post-surgical removal and lens implantation. (*Id*.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*.) Before proceeding to step four, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to professions which do not require reading of newsprint sized or smaller fonts; no commercial driving; and occasional manipulation of small objects (dime sized or less). She would need to be allowed to wear sunglasses while working.

(R. at 22.)

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

At step four, the ALJ relied on testimony from the VE to find that Plaintiff was unable to perform any of her past relevant work. (R. at 25.) The ALJ also relied on testimony from the VE at step five to determine that in light of Plaintiff's age, education, work experience, and RFC, she was able to perform jobs that existed in significant numbers in the national economy. (R. at 26.) The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act since August 11, 2016. (R. at 27.)

## III.    RELEVANT RECORD EVIDENCE

### A.    Plaintiff's Testimony

At the May 13, 2019, hearing, Plaintiff testified to the following facts about her living situation and work history. Plaintiff lived alone in an apartment. (R. at 47.) She had a driver's license and still drove during the day but had stopped driving at night because of the light from cars. (*Id*.) Plaintiff was currently working three hours a day as a home health aide. (R. at 47–48.) Her job involved dusting, cleaning, washing dishes, making the bed, and doing weekly laundry for a single client. (R. at 48.) Plaintiff had performed that job for nine months. (*Id*.) She would call off work once or twice a week because she would wake up and her eyesight was bad. (R. at 58.) Prior to that job, she had worked for about six or seven months as an office cleaner. (R. at 48–49.)

Plaintiff also testified to the following facts about her medical problems. She experienced a lot of blurriness, and it was hard for her to see things like the directions on the back of a package. (R. at 52.) She had tried glasses but due to her eye inflammation, she was not given a prescription. (*Id*.) She had quit the office cleaning job because it was at night, and she could not see at night. (*Id*.) Although she could see some things, it was harder to see, and she had to strain a little just to see "some of it." (*Id*.) If things were not too small, it was okay, but she could not see little stuff, like a quarter, lying on the floor. (R. at 52–53.) She could,

4

however, see a quarter, dime, or a pea sitting in plain sight on a table. (R. at 53.) She no longer read unless it was large bold print. (*Id*.) She could not read her mail without help from her adult children. (R. at 53–54, 47.) She wore sunglasses all day every day, even inside, to deal with her sensitivity to bright light. (R. at 54–55.)

### B. The ME's Testimony

At the May 13, 2019, hearing, the ME, an ophthalmologist, testified to the following. In 2012, Plaintiff was diagnosed with idiopathic uveitis in both eyes. (R. at 39–40.) Uveitis is inflammation of the blood vessel layer underneath the retina and iris that can sometimes cause discomfort. (R. at 39.) Plaintiff's problem was mainly manifested, however, as floaters— inflammatory debris that would "float around" in her eye. (*Id*.) Plaintiff underwent a vitrectomy to remove the debris and floaters in March 2016. (R. at 40.) She also had steroid injections for her uveitis-related inflammation when she had surgery and at different times over the years. (R. at 40, 41.) As of February 2017, Plaintiff's inflammation and uveitis were resolved. (R. at 43.)

The ME also testified to the following. Plaintiff developed cataracts and underwent surgeries in December 2015 and November 2016 to treat them. (R. at 40–41.) A YAG capsulotomy was done in June 2016 to allow light to pass through a posterior capsule that held Plaintiff's right cataract lens in place after her cataract surgery in that eye. (R. at 41.) Plaintiff also developed macular edema, or swelling in the macula, that had been treated with steroids and was resolved at the time of the hearing. (R. at 42.)

The ME further testified that Plaintiff had Bests disease, a progressive hereditary disease that usually causes problems later in life. (R. at 41.) Although Bests disease does not cause total blindness because it does not impact peripheral vision, it affects central vision. (R. at 41–42.) As a result of Plaintiff's Bests disease, her vision had not really improved despite the vitrectomy and the cataract surgeries. (*Id*.) The record contained one measurement of Plaintiff's visual

5

acuity with glasses. (R. at 40, 42.) That measurement, done in September 2012, found that Plaintiff's vision with glasses was 20/40 in the right eye and 20/50 in the left eye. (R. at 40.) Her uncorrected vision was in the 20/60 to 20/70 range at its worst but was sometimes better. (R. at 42.) For instance, in February 2017, her uncorrected vision was 20/40 in each eye, but her vision was a little better in June of that year. (*Id*.) Tests in March 2019 showed that she had 20/70 vision in the right eye and 20/60 vision in the left that was improved to 20/50 in each eye with a pinhole, which is a way to approximate Plaintiff's best corrected vision. (*Id*.) Plaintiff's Bests disease was also diagnosed as stable as of February 2017, meaning that it was not progressing. (R. at 43.)

The ME opined that Plaintiff did not meet or equal any of the Listings, including 2.02, as that Listing required vision of 20/200 and Plaintiff's vision was "far better than that." (*Id*.) The ME further opined, however, that Plaintiff would have the following functional limitations. (*Id*.) Plaintiff would be unable to read small print and see the normal fonts on computers. (*Id*.) She would also have difficulty discriminating small objects like bolts, nuts, and wires. (R. at 43.) Additionally, although Plaintiff might still be capable of personal driving, she should not do commercial driving and might have trouble with bright lights. (*Id*.) On the other hand, the ME opined that Plaintiff would not have problems around moving objects, unprotected heights, or negotiating her way around normal workplace hazards. (*Id*.) Nor would climbing scaffolds or ladders be a problem. (*Id*.) The ME further opined that although the effort to sustain an activity might tire Plaintiff, there was no reason that she could not be able to do what she did earlier in a workday if she stopped, rested, and went back to work a little bit later. (R. at 45.)

###### C.     Relevant Treatment Records

The records indicate that Plaintiff treated with Dr. Opremcak, an ophthalmologist, both before and after her alleged date of onset.  Dr. Opremcak's records from after the alleged date of onset indicate that Plaintiff's uveitis was inactive in March 2013 (R. at 276), but active in May, July, and August of that year (R. at 272, 268, 266).  On August 16, 2013, Plaintiff reported that she felt much better after her prednisone had been increased.  (R. at 265.)  In September 2013, Plaintiff reported that she was doing about the same and had no new complaints.  (R. at 263.)  In November 2013, Plaintiff reported that she felt "good" and that she felt that she was "doing very well."  (R. at 261.)  In December 2013, however, Plaintiff reported that she had a flare up and felt like her uveitis was back.  (R. at 259).  Dr. Opremcak's records from 2013 also noted that Plaintiff had been diagnosed with Bests disease.  (R. at 274, 273, 271, 268, 266, 264, 262, 260, 258.)  His 2013 records reflect that Plaintiff's uncorrected vision ranged from 20/25 (R. at 277, 273, 265, 263) to 20/40 (R. at 267) on the right, and from 20/25 (R. at 263, 261) to 20/80 (R. at 269) on he left.

 Dr. Opremcak's 2014 records indicate that Plaintiff reported that she was maybe a little better in February of that year although her vision was still blurry.  (R. at 255.)  An examination that month showed that she had less inflammation.  (R. at 254.)  In May of 2014, Plaintiff's uveitis was inactive.  (R. at 250.)  During an examination in December 2014, however, both of her eyes were mildly inflamed.  (R. at 248.)  Dr. Opremcak recommended that Plaintiff receive an injection in her right eye and return for an injection in the left eye, but Plaintiff opted to have an oral prednisone pulse.  (*Id*.)  Dr. Opremcak's 2014 records continued to note Plaintiff's Best disease diagnosis.  (R. at 256, 254, 252, 250, 248.)  His 2014 records additionally indicate that Plaintiff's uncorrected vision ranged from 20/25 (R. at 250) to 20/60 (R. at 257) on the right, and from 20/25 (R. at 250) to 20/200 (R. at 257) on the left.

Dr. Opremcak's records indicate that in March 2015, Plaintiff had active inflammation in both eyes. (R. at 244.) She opted for an oral prednisone pulse that month instead of an injection because she did not have transportation. (*Id*.) His records further indicate that Plaintiff still had inflammation in April 2015, and that she received injections in both eyes that month. (R. at 241.) An examination in May 2015 found that both of Plaintiff's eyes looked good, and Dr. Opremcak wrote that the injection had worked well to clear her inflammation and no additional treatment was needed at that time. (R. at 236.) In September 2015, Plaintiff received an injection in her right eye after an examination found that she had inflammation in it. (R. at 233–34.) It was also noted that a cataract in her right eye had progressed. (*Id*.) In October, November, and December 2015, Plaintiff had no active inflammation in either eye. (R. at 232, 230, 227.) Dr. Opremcak recommended, however, that Plaintiff have a cataract evaluation. (R. at 227.) Dr. Opremcak's 2015 records continued to note Plaintiff's Bests disease (R. at 243, 240, 238, 236, 233, 231, 229, 226). In 2015, Plaintiff's uncorrected vision ranged from 20/25 (R. at 238) to 20/80 (R. at 231, 226) on the right, and from 20/40 (R. at 238, 235, 231) to 20/70 (R. at 233, 226) on the left.

On January 14, 2016, Dr. Opremcak wrote that Plaintiff's uveitis was stable, and she only had trace inflammation in the right eye. (R. 224, 225.) On January 21, February 4, and March 10, 2016, Dr. Opremcak wrote that Plaintiff's uveitis was resolving. (R. at 223, 220, 218.) On March 10, 2016, an examination found that Plaintiff had no active inflammation in either eye but that she had vitreous debris in her right eye. (R. at 219.) A vitrectomy was performed on Plaintiff's right eye on March 12, 2016, to remove that debris. (R. at 202.) Plaintiff also underwent a YAG laser capsulotomy for a cataract in her right eye in June 2016. (R. at 306.) In April, June, and July 2016, Dr. Opremcak wrote that Plaintiff had good post-operative

8

appearance and no complications with surgery. (R. at 216, 214, 212.) In July, October, and

December 2016, Dr. Opremcak wrote that Plaintiff's vitreous debris was resolved and that she

had no active inflammation in either eye in October and December. (R. at 208, 204, 206.) Her

cataract in her left eye was, however, worsening, and Plaintiff had surgery for that in November.

(R. at 208, 203, 300.) In July, October, and December 2016, Dr. Opremcak wrote that Plaintiff's

Bests disease was stable. (*Id*.) In December, Plaintiff had macular edema, but she received an

injection and tolerated it well. (R. at 206.) In 2016, Plaintiff's uncorrected vision ranged from

20/50 (R. at 220) to 20/80 (R. at 224) on the right, and from 20/50 (R. at 224, 222) to 20/60 (R.

at 220) on the left.

Dr. Opremcak's 2017 records indicate that Plaintiff had macular edema in February 2017,

but that no additional treatment was needed. (R. at 437.) That same month, Plaintiff had active

inflammation related to her uveitis and Dr. Opremcak recommended an injection for that. (*Id*.)

Plaintiff opted instead to try a prednisone pulse. (*Id*.) In March, June, August, October, and

December 2017, Dr. Opremcak wrote that Plaintiff's uveitis was resolved, she had no

inflammation, and her Bests disease was stable. (R. at 433, 429, 426, 422, 418.) In August and

October 2017, Dr. Opremcak also wrote that Plaintiff's macular edema was resolved. (R. at 425,

421.) Dr. Opremcak recommended that Plaintiff receive an injection in October, but Plaintiff

opted to schedule one when she had transportation. (R. at 422.) In December, Dr. Opremcak

also recommended that Plaintiff start a prednisone pulse. (R. at 418.) During 2017, Plaintiff's

uncorrected vision ranged from 20/30 (R. at 428) to 20/100 (R. at 417) on the right, and from

20/40 (R. at 436, 432,428) to 20/70 (R. at 425) on the left.

In April 2018, Dr. Opremcak wrote that Plaintiff's macular edema was greatly improved

after she received a prednisone pulse. (R. at 414.) He also wrote that Plaintiff had no active

inflammation and that her Bests disease was stable in April, June, and October 2018. (R. at 414, 406, 397.) In October 2018, there was also no evidence of macular edema. (R. at 397.) In November 2018, however, Plaintiff had active inflammation in both of her eyes, and she received a right eye injection. (R. at 394.) Plaintiff's uncorrected vision ranged from 20/40 (R. at 396, 393) to 20/50 (R. at 413) on the right, and from 20/30 (R. at 396) to 20/40 (R. at 413, 405, 393) on the left.

In February 2019, Plaintiff's left showed signs of inflammation and Plaintiff elected a prednisone pulse over an injection. (R. at 442.) In March 2019, however, she had no inflammation and no evidence of macular edema. (ECF No. 21–1, at PageID # 528.)[3] At both visits, Dr. Opremcak noted that Plaintiff's Best disease was stable. (R. at 442; ECF No. 21–1, at PageID # 528.) In February 2019, Plaintiff's uncorrected vision was 20/60 on the right and 20/70 on the left. (R. at 441.) In March 2019, Plaintiff's uncorrected vision was 20/70 on the right and 20/60 on the left. (R. at 443.)

### D.    State Agency Consultants and Reviewers

In September 2016, state agency reviewer, David Knierim, M.D., reviewed Plaintiff's file at the initial level. (R. at 111.) Dr. Knierim opined that Plaintiff had no exertional, postural, manipulative, communicative, or environmental limitations. (*Id*.) He further opined, however, that Plaintiff's near and far acuity were limited in the left eye. (*Id*.)

In March 2017, state agency reviewer, Michael Delphia, M.D., reviewed Plaintiff's file at the reconsideration level. (R. at 287–94.) Dr. Delphia opined that Plaintiff had no exertional, postural, manipulative, or communicative limitations. (R. at 288–90.) He further opined, however, that Plaintiff had some visual limitations. Specifically, he opined that Plaintiff's near

---

[3] Plaintiff attached this page to her Statement Errors, which appears to be a page that is missing from the record. (R. at 445.)

and far acuity were both limited, but that Plaintiff had no limitations with regard to depth perception, accommodation, color vision, and field of vision. (R. at 290.) In addition, Dr. Delphia opined that Plaintiff had some environmental limitations– he opined that due to her loss of vision, she should avoid all exposure to hazards such as machinery and heights. (*Id*.) On the other hand, he opined that Plaintiff had no other environmental limitations, including that she was unlimited with regard to exposure to fumes, odors, gases, and poor ventilation. (R. at 291.)

## IV.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*

11

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## V. ANALYSIS

### A. The ALJ's Consideration of Plaintiff's Impairments When Assessing the RFC

Plaintiff contends that the ALJ committed reversible error because he failed to consider all of Plaintiff's impairments when assessing her RFC. Specifically, Plaintiff alleges that the ALJ erred because, even though he determined that her recurrent uveitis was a severe impairment at step two, he failed to consider her uveitis when assessing her RFC. (ECF No. 21, at PageID # 523–24.) This allegation of error lacks merit.

When assessing an RFC, an ALJ must consider "all of a claimant's impairments." *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)). The Social Security regulations further describe what an ALJ must take into account: "we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity." 20 C.F.R. § 404.1545(e). If the claimant has multiple impairments, an ALJ must "consider the combined effect of all of [a claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523(c). Generally, the ALJ should "consider the combined impact of impairments throughout the disability determination process." *Id.*

Even a cursory reading of the ALJ's opinion reveals that he thoroughly considered Plaintiff's uveitis. At step two, the ALJ noted Plaintiff's uveitis and determined that it was a severe impairment. (R. at 21.) At step three, the ALJ considered all of Plaintiff's severe impairments and concluded that none of them, singly or in combination, met or equaled a Listed impairment. (R. at 22.) The ALJ's formulation of Plaintiff's RFC was also proper. The ALJ discussed all of Plaintiff's impairments in detail. (R. at 23–24.) In that detailed discussion, the ALJ specifically noted the following about Plaintiff's uveitis and her inflammation related to the same.

> The claimant does have a history of recurrent uveitis dating back to her alleged onset date, as well as other vision impairments . . . . As of May 23, 2014, her acuity was noted to be 20/40 in both eyes, with no active uveitis . . . . In March 2016 the claimant ultimately underwent a vitrectomy for removal of vitreous debris related to her chronic uveitis . . . . On follow up, the claimant was noted to have resolving uveitis with good post-operative appearance . . . . As of February 2017 . . . [s]he did exhibit some active inflammation related to uveitis, and the claimant was treated with a pulse of prednisone. On follow up in march [*sic*] 2017, no active inflammation seen . . . . As of her April 2018 ophthalmology visit the claimant exhibited no active inflammation and was to continue her current medications . . . . the [*sic*] claimant returned in June 2018 with complaints with her eyes feeling inflamed and blurrier vision . . . She exhibited no active inflammation . . . . As of November 2018 . . . examination revealed inflammation in both eyes. An injection was given in the right eye . . . . The claimant subsequently elected for prednisone over an injection in the right eye . . . . As of her most recent ophthalmology visit . . . she evidenced no inflammation.

(R. at 23–24.) The ALJ's discussion therefore demonstrates that he explicitly considered Plaintiff's uveitis when assessing her RFC. Moreover, the ALJ affirmatively wrote that he had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence." (R. at 22.) For these reasons, this claim of error is rejected.

In this same allegation of error, Plaintiff also appears to assert that the ALJ erred by failing to include in her RFC a limitation that she needed protection from dust and chemicals. (ECF No. 22, at PageID # 524.) This assertion also lacks merit. The ME opined that Plaintiff would be unable to read small print or see the normal fonts on computers; she would have difficulty discriminating small objects; she could not do commercial driving; and she might have trouble with bright lights. (R. at 43–44.) The ALJ afforded the ME's opinion significant weight and incorporated all of those opined limitations into Plaintiff's RFC. (R. at 24.) The state agency medical consultant at the reconsideration level opined that Plaintiff was unlimited with regard to exposure to fumes, odors, dusts, gases, and poor ventilation. (R. at 291.)[4] In short, there is no record evidence that supports a limitation for protection from dust and chemicals and the record in fact contains evidence that Plaintiff was unlimited with regard to exposure to dusts, fumes, and gases. The ALJ's decision is supported by substantial evidence. This claim, therefore, is also rejected.

**B.      The ALJ's Reliance on the VE's Testimony**

Plaintiff next contends that the ALJ erred by relying on the VE's testimony because it was inconsistent with the DOT and the VE did not adequately explain the reason for those discrepancies. (ECF No. 22, at PageID # 524–25.) This allegation of error lacks merit.

At step five, the Commissioner has the burden of demonstrating a significant number of jobs exist in the local, regional and national economies that a claimant can perform given his or her RFC, age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). In making

---

[4] The ALJ gave some weight to the consultant's opinion because other limitations that the consultant opined, ones that are not at issue in this case, were not consistent with the record evidence. (R. at 24–25.) But the ALJ did not discount the consultant's opinion that Plaintiff had no limitations with read to exposure to fumes, odors, dusts, gases, and poor ventilation.

that determination, the Commissioner "may use the services of a vocational expert or other specialist." 20 C.F.R. § 404.1566(e). "The testimony of a vocational expert identifying specific jobs available in the regional economy that an individual with the claimant's limitation could perform can constitute substantial evidence supporting an ALJ's finding at step 5 that the claimant can perform other work." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 549 (6th Cir. 2004) (collecting cases). Such testimony satisfies the substantial evidence requirement when it is in response to a hypothetical question that "accurately portrays [the claimant's] individual physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010) (quoting *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002)).

Under the regulations, to determine what work exists in the national economy, ALJs and VEs "will take administrative notice of reliable job information available from various governmental and other publications," including the DOT. 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1); *see also* SSR 00-4P, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000) ("In making disability determinations, we rely primarily on the DOT (including its companion publication, the SCO [Selected Characteristics of Occupations] ) for information about the requirements of work in the national economy."). Consequently, "[o]ccupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT." *Id.* "When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled." *Id.* Nevertheless, an "ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00-4p." *Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009) (citing *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir.

2009)). Instead, "[t]his obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT." *Beinlich*, 345 F. App'x at 168.

In this case, the VE testified that a hypothetical individual with Plaintiff's RFC and vocational profile would be capable of performing the requirements for medium unskilled occupations such as laundry worker,[5] floor technician,[6] and machine feeder.[7] (R. at 61.) The ALJ then asked the VE if his testimony conflicted with the DOT. (R. at 63.) The VE responded that his testimony was "not inconsistent with the DOT." (*Id*.) He further explained that although some of the hypotheticals posed to him by the ALJ included restrictions that were not addressed in the DOT, his testimony about them was based on his work experience as a vocational rehabilitation counselor and case manager case. (*Id*.) Plaintiff's counsel then offered closing remarks asking the ALJ to make a disability finding based on certain facts and hypotheticals. (*Id*.) Plaintiff's counsel did not, however, cross-examine the VE about any purported conflicts between his testimony and the DOT.

As an initial matter, the Court is not convinced that the VE's testimony contained an apparent unresolved conflict as contemplated under SSR 00–4p. Plaintiff currently contends that the laundry worker position requires working with heat and wetness; the floor technician position requires working with cleaning agents; and the machine feeder position requires working with carbon and graphite products. (ECF No. 21, at PageID #525.) Even if these contentions are true, the hypotheticals presented to the VE did not contain any such restrictions. Instead, the hypotheticals posed to the VE contain the restrictions that were in Plaintiff's RFC. And Plaintiff points to no evidence in the record demonstrating that the ALJ should have incorporated

---

[5] DOT 361.685–014
[6] DOT 389.667–010
[7] DOT 699.686–010

restrictions about heat and wetness, cleaning agents, or graphite products into Plaintiff's RFC. Nor does the Court find any after independent review.

To the extent any such conflict existed, the ALJ properly asked the VE if his testimony was consistent with the DOT and the VE said it was "not inconsistent." Therefore, the ALJ satisfied his obligation under SSR 00–4p. *See Lindsley*, 560 F.3d at 606 (SSR 00-04p satisfied by the ALJ's question to the VE as to "any apparent discrepancies between the information provided by the DOT and that which [the VE] himself presented"; after the VE responded that there were no such discrepancies, "[t]he ALJ had no duty under S.S.R. 00–4p to interrogate him further.") (*citing Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006) ("Nothing in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct.")). It was incumbent upon Plaintiff's counsel to cross-examine the VE at that point. Counsel did not do so. Accordingly, the Court finds that the ALJ did not commit reversible error when relying on the VE's testimony.

## C. The ALJ's Subjective Symptom/Credibility Analysis

Plaintiff alleges that the ALJ erred when assessing Plaintiff's subjective symptoms. This contention of error lacks merit.

The Sixth Circuit has provided the following guidance in considering an ALJ's credibility assessment:[8]

---

[8] An ALJ's consideration of a claimant's statements about symptoms and limitations, generally known as credibility analysis, is required. But, as clarified by SSR 16-3p (applicable as of March 28, 2016), the focus is not on the claimant's propensity for truthfulness or character but rather on the consistency of her statements about the intensity, persistence, and limiting effects of symptoms with the relevant evidence. *See* SSR 16-3p, 2017 WL 5180304 at *2, *6, *11. Consequently, the Court uses the term "credibility" in the context the consistency of Plaintiff's statements about her symptoms with the evidence in the record.

Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain. 20 C.F.R. § 416.929(a); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994). First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a). Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities. *Id.*

*Rogers*, 486 F.3d at 247.

!

"The ALJ's assessment of credibility is entitled to great weight and deference." *Infantado v. Astrue*, 263 F. App'x. 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x. 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)). This deference extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints of pain." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Hum. Servs.*, 823 F.2d 918, 920 (6th Cir. 1987)). Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531. Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted). An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248; *see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06-CV-1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29, 2012) ("While the ALJ's credibility

findings 'must be sufficiently specific', *Rogers*, 486 F.3d at 248, the intent behind this standard is to ensure meaningful appellate review.").

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. In addition, the regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of medication; and treatment other than medication. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p, 1996 WL 374186 (July 2, 1996); *but see Ewing v. Astrue*, No. 1:10-cv-1792, 2011 WL 3843692, at *9 (N.D. Ohio Aug. 12, 2011) (suggesting that although an ALJ is required to consider such factors, he or she is not required to discuss every factor within the written decision) *report and recommendation adopted*, 2011 WL 3843703, (N.D. Ohio Aug. 30, 2011).

At the first part of the two-part analysis, the ALJ determined that Plaintiff had a medically determinable impairment that could reasonably be expected to cause her alleged symptoms. (R. at 23, 25.) But at the second part, the ALJ determined that Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical and other evidence in the record for the reasons explained in the decision. (*Id*.) Plaintiff alleges that when the ALJ made that second determination, he failed to consider objective evidence in the record demonstrating that Plaintiff suffered from worsening eyesight and that she used drops, oral medications, injections, and surgeries to try and improve her vision and only once refused an injection at a treatment appointment because she had transportation issue. (ECF No. 21, at PageID # 526.)

Plaintiff mischaracterizes the ALJ's subjective-symptom analysis. The ALJ engaged in a detailed discussion of the medical records including records reflecting Plaintiff's vision issues

and treatments. The ALJ explained that treatment records from prior to Plaintiff's alleged date of onset indicated a history of her reporting blurriness, floaters, and photophobia. (R. at 23.) The ALJ then described medical records from after Plaintiff's alleged date of onset. In that discussion, the ALJ described medical findings and history from 2013 through 2015. The ALJ noted that during this time period, Plaintiff's visual acuity varied and that she was diagnosed with Bests disease, but that her eyesight had not shown progressive deterioration. (*Id*.) The ALJ also noted that prior to the alleged date of onset, Plaintiff had used eyedrops after being diagnosed with Bests disease; undergone a vitrectomy in March 2016 to remove vitreous debris due to her chronic uveitis; and underwent cataract surgery in June 2016. (*Id*.)

The ALJ then described medical records from after Plaintiff's alleged date of onset. In that discussion, the ALJ described the following information from records in 2016 and 2017. Plaintiff had a second cataract surgery in November of 2016. (*Id*.) In February 2017, Plaintiff's Bests disease was noted to be stable. (*Id*.) Plaintiff was treated with steroids injections for macular edema. (*Id*.) Plaintiff was also treated with prednisone for active inflammation due to her uveitis, and the inflammation resolved. (*Id*.) Plaintiff's visual acuity varied during this period. (*Id*.) Plaintiff had 20/40 vision in each eye in February 2017; 20/30 vision in the right eye and 20/40 -1 in the left eye in June 2017; and 20/40 vision in the right eye and 20/70 vision in the left eye in August 2017. (*Id*.)

The ALJ also described the following information from records in 2018 and 2019. In April 2018, Plaintiff exhibited no active inflammation in her eyes, her macular edema was noted to have been greatly improved following a prednisone pulse and durezol; and she had 20/50 vision in the right eye which was improved to 20/40 with use of a pinhole, and 20/40 vision in the left eye. (*Id*.) In June 2018, Plaintiff complained about feeling more inflammation and

blurrier vision, but she still had 20/50 vision in the right eye and 20/40 vision in the left eye. (*Id*.)  In November 2018, Plaintiff had 20/40 vision in both eyes, and was given an injection in the right eye because she complained about eye pain.  (*Id*.)  At a subsequent visit, Plaintiff elected treatment with prednisone instead of an injection in her eye.  (*Id*.)  In March 2019, Plaintiff had 20/70 vision in her right eye and 20/60 vison in the left eye which was improved to 20/50 with use of a pinhole.  (*Id*.)  Her Bests disease was noted as stable and she had no active inflammation.  (*Id*.)

Thus, contrary to Plaintiff's claims, the ALJ considered objective evidence related to Plaintiff's vision issues and her treatments, including injections.  The ALJ's analysis accurately describes the information contained in medical records, and therefore, it is supported by substantial record evidence.  To the extent Plaintiff alleges that the ALJ erred by discrediting her statements about the intensity, persistence and limiting effects of her symptoms because the ALJ noted that she opted for prednisone instead of an injection at one visit, that allegation of lacks merit.  (ECF No. 22, at PageID # 526.)  The record reflects that Plaintiff opted for prednisone instead of an injection on several occasions.  (R. at 244, 422, 442.)  The ALJ accurately noted one of those instances but also noted many other facts in the record about Plaintiff's treatment history.  This was not error.

For these reasons, the Court does not find that the ALJ committed reversible error when performing the subjective symptom analysis.  Plaintiff's claim to the contrary lacks merit.

## VI.   CONCLUSION

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's non-disability determination and **OVERRULES** Plaintiff's Statement of Errors.  The Clerk is **DIRECTED** to enter judgment in favor of the Commissioner.

**IT IS SO ORDERED.**


**Date:**  November 16, 2021                    /s/  *Elizabeth A. Preston Deavers*
                                               **ELIZABETH A. PRESTON DEAVERS**
                                               **UNITED STATES MAGISTRATE JUDGE**